UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AHARON HUDGINES, | CASE NO. 1:13CV2411 |
| Plaintiff, | JUDGE DONALD C. NUGENT |
| v. | Magistrate Judge George J. Limbert |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Defendant. | |

Aharon Hudgines ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

I. **PROCEDURAL AND FACTUAL HISTORY**

Plaintiff applied for DIB and SSI on October 27, 2010, alleging disability since June 20, 2007. Plaintiff's date last insured is March 31, 2011. The SSA denied Plaintiff's applications initially and on reconsideration. ECF Dkt.#13, Transcript of proceedings ("Tr.") at 66-111.[2] Plaintiff requested an administrative hearing, and on July 27, 2012, the ALJ conducted an administrative hearing *via* video conference and accepted the testimony of Plaintiff and his mother, Pamela Hudgines ("Ms. Hudgines"). Tr. at 29-65. On September 10, 2012, the ALJ issued a Decision

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] Plaintiff's previous applications for benefits, filed on January 14, 2009, were denied on March 23, 2009. Plaintiff did not appeal that decision. Because the alleged onset date in current applications is June 20, 2007, the ALJ interpreted the current applications as an "implied request to reopen the previous decision." Tr. at 11. As no new evidence that would not have been available in connection with the prior claims was offered, the ALJ declined to reopen the previous decision.

denying benefits. Tr. at 11-23. Plaintiff appealed the Decision, and on September 12, 2013, the Appeals Council denied review. Tr. at 1-4.

On October 30, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On February 19, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #13. On March 20, 2014, Defendant filed a brief on the merits. ECF Dkt. #14. No reply brief was filed.

**II**.    **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffers from bipolar disorder, schizoaffective disorder, and mood disorder NOS, which qualified as severe impairments under 20 C.F.R. §404.1520(c) and 416.920(c). Tr. at 14. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526, or 416.920(d), 416.925 and 416.926 ("Listings"). Tr. at 14.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations: Plaintiff is limited to simple routine repetitive tasks; a low stress job defined as no more than occasional changes in the work setting, and no more than occasional decision making required; with no production rate or pace work; no interaction with the public; and occasional and superficial interaction with coworkers with no tandem tasks. Tr. at 16. The ALJ ultimately concluded that, although Plaintiff had no past relevant work, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of hand packager, kitchen helper, and paint spray inspector. Tr. at 22. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

**III.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     ANALYSIS

Plaintiff advances a single argument in this appeal. Plaintiff contends that the ALJ erred when he did not give adequate weight to the opinion of a nurse practitioner, who treated Plaintiff over the course of three years, and opined that Plaintiff could not perform full-time work.

### A.     Medical history

On October 14, 2004, Plaintiff was treated at St. Vincent Charity Hospital. He was brought in by the police and had to be restrained and sedated. Tr. at 297. He was released on the morning of October 15, 2004, but the following day he was taken by his father to South Pointe Hospital. Plaintiff admitted to paranoid ideation, and that he had been checking the newspapers to see if he committed a crime. He reported not sleeping at night. Tr. at 311. Plaintiff's father reported that Plaintiff had delusional thoughts, paranoia, and seemed very manic. Tr. at 316.

According to a crisis assessment from Mental Health Services for Homeless Persons, dated September 11,2007, Plaintiff's mother referred him because he was stressed and having difficulties for at least one year with mood swings. He was verbally abusive and manipulative. Tr. at 320. He had paranoia, decreased sleep, prosecutory delusions and mood swings. On a mental status exam, it was noted that Plaintiff had visible generalized slowing of movement and speech and he conveyed little information because it was too abstract, concrete, repetitive or stereotyped. Tr. at320. He reported that he believed that people are watching him. Tr. at 321. Plaintiff had a blunted affect and was suspicious, angry and hostile. Tr. at 321. Plaintiff's mother, Ms. Hudgines reported that he had been snapping, hollering and throwing trays Tr. at 322. Plaintiff was diagnosed with a mood disorder and bipolar disorder by history and assigned a Global Assessment of Functioning ("GAF")

score[3] of 65, indicating mild symptoms. Plaintiff was also diagnosed with a cannabis-induced mood disorder by history Tr. at 324. He denied alcohol and drug use. Plaintiff stated that he needed to get medication. He reported that police pulled him over and found a gun in the car. Tr. at 326.

Plaintiff treated with Dr. Rochelle Beachy on May 27, 2008 for an evaluation of his ribs and right great toe. Plaintiff reported that he had been in a physical fight with his father and noticed later that his ribs were hurting and he had a bulge in his left lower rib cage that made it difficult to sleep Tr. at 342. His mother, Ms. Hudgines reported that Plaintiff was violent and verbally abusive and she advised her ex-husband to protect himself because he was just letting Plaintiff hit him. She stated that Plaintiff is unable to hold a job but she does not want him to be homeless. However, she stated that she does not feel that she can keep supporting him or living with him. Tr. at 342. Plaintiff treated with Dr. Karen Kea on November 28, 2008. He requested a referral for mental health due to his bipolar disorder. Tr. at 340. Dr. Kea diagnosed bipolar disorder and a visual disturbance.

Plaintiff treated with Anthony E. Boyd, LISW, on January 12, 2009. He reported that he needed to find out what was really wrong with him because he believed he was bipolar or schizophrenic. Tr. at 329. Plaintiff reported that his current medications were Zyprexa, Floxin, Zithromax and Naprosyn. His symptoms were paranoid ideation, prosecutory delusions, and perceptual disturbances. Plaintiff said that words look distorted if he stares at them for long periods. He was having sudden mood swings, agitation leading to fights and arguments, especially when not taking his medication, as well as racing thoughts, irritability, restlessness and sleep disturbance. Tr. at 329. He reported that he smoked pot in high school but, he had stopped a year before. He said that he has no more than two drinks every four months. Tr. at 330.

Plaintiff reported that he was unable to keep steady employment due to set backs with his mental illness, particularly not being able to stay on medications to control his paranoia and mood swings. Tr. at 330. It was noted that he was verbally impulsive and tends to drift off. Tr. at 332. He

---

[3]The GAF is a numeric scale (1 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, e.g., how well or adaptively one is meeting various problems-in-living.

was diagnosed with mood disorder and rule out bipolar disorder. Mr. Boyd assigned a GAF score of 55, indicating moderate symptoms. Tr. at 333-334.

Records from Mr. Boyd dated March 2, 2009 reveal that Plaintiff's mood was stable on medications and his energy level was okay, but he was feeling depressed for two weeks. Tr. at 372. He reported that he had recently broken up with his girlfriend. Plaintiff was diagnosed with mood disorder, NOS Tr. at 373. Plaintiff saw Mr. Boyd again on March 31, 2009. He was training for a clerical job located at the mental health board and he reported that he was thinking of enrolling in school now that his mental health was stable on medications. Tr. at 370. His attention span and concentration were sustained; his judgment and insight were good. Tr. at 371. He was diagnosed with bipolar disorder. Tr. at 372.

Plaintiff treated at the emergency room on August 21, 2009. His father reported to the doctor that his son was paranoid and not able to sleep and had pain in the left breast area and mid sternum Tr. at 409. Plaintiff had multiple somatic complaints in the past and became fixated on the belief that he has a physical illness. He has been intermittently compliant with his medications and was currently taking them. Tr. at 410. Plaintiff was diagnosed with bipolar disorder with paranoia and atypical chest pain. Tr. at 411.

Plaintiff treated with Rebecca Snider-Fuller, RN on August 2, 2010 for refills of his medications. He stated that he had been consistently on Zyprexa for five years although he had not been seen since March 19, 2009. Tr. at 404. He reported that he wanted a different antidepressant than Wellbutrin because it was making him feel dizzy and nauseous. Plaintiff said that, if he does not take his medications for a few days, he gets more irritable and angry and he misinterprets things. He brought his mother to his appointment but he did not want her to participate. Ms. Snider-Fuller talked to Ms. Hudgines briefly, who indicated that there were more issues. Tr. at 404. On the mental status exam, he had racing thoughts, paranoid thoughts, believing that people were looking at him and talking about him. Tr. at 404. He had a constricted affect although his attention and concentration were rated as okay. He was diagnosed with bipolar disorder Tr. at 405.

On August 5, 2010, Plaintiff went to the emergency room as instructed by his primary care physician because he was having extreme anxiety and he needed an adjustment to his medication.

He reported having thoughts of not existing anymore, visual hallucinations, and paranoia. Tr. at 395. At that time, Plaintiff reported that he felt like people wanted to hurt him and it was noted that last year, he was seen in the same emergency department believing that he had been shot, although the exam was unremarkable for evidence of trauma. Tr. at 396. Both Plaintiff and his mother reported that they wanted his symptoms to be controlled so that he could be more functional and better take care of his child. Plaintiff reported that he smokes one-half pack per day and drinks alcohol very occasionally, maybe once every three months. Tr. at 396. He was diagnosed with paranoid behavior and depression. Tr. at 400.

Ms. Snider-Fuller treated Plaintiff on August 26, 2010 for bipolar and psychotic symptoms Tr. at 387. He reported that one month before, he had a "scuffle" with his girlfriend and the police were called .Tr. at 387. He had a court case as a result, which had caused him high anxiety and he had become more paranoid. He had panic attacks daily and they became worse after the fight. Plaintiff suggested that his dose of Zyprexa needed to be increased. He reported hearing negative voices in his head but that they had lessened since taking Zyprexa. At one point, his father was going to leave the room and Plaintiff requested that he stay because he said that he was too nervous. Plaintiff reported that, when he was not on his medication, the voices were worse and he had mood swings. He reported that his mood fluctuated between low energy depressed and high energy angry but, he did not experience those symptoms when on Zyprexa. He was diagnosed with schizoaffective disorder, bipolar type; adjustment disorder with anxiety; and assigned a GAF score of 55, indicating moderate symptoms. Tr. at 390.

Plaintiff treated with Ms. Snider-Fuller on November 3, 2010 for pharmacological management. He was taking Klonopin, Paxil and Zyprexa. Plaintiff's mother reported that he would be seeing a court psychiatrist soon and that he had a case for domestic violence pending. Tr. at 384. His mother reported that Plaintiff was eating all the time and that he had gained thirty pounds. He was diagnosed with schizoaffective, bipolar type; adjustment disorder with anxiety; and assigned a GAF score of 55. Tr. at 385.

On March 14, 2011, Plaintiff reported to Ms. Snider-Fuller that he was tolerating the Seroquel. He stated that someone broke into his house and stole his computer and his aunt died. His

aunt had Alzheimer's disease, wandered out in the snow and froze to death. Tr. at 549. He reported that the night prior, he was feeling paranoid and talked to his mother for awhile. He had gained forty-five pounds in the past year. Tr. at 549. His behavior was guarded but appropriate; his thought process was logical and organized, he but had paranoid thoughts; his affect was constricted; his attention and concentration and memory were okay. Tr. at 550. He reported having paranoid thoughts, some irritability and improved sleep. He was assigned a GAF score of 55-60. Tr. at 550.

Ms. Snider-Fuller completed a psychological questionnaire on March 11, 2011 stating that she had treated Plaintiff monthly since January 12, 2009. Tr. at 465. She diagnosed schizoaffective disorder and bipolar mixed type. She opined that Plaintiff's symptoms were paranoia, auditory hallucinations, mood swings, low energy, depressed and high energy anxiety. She reported that he responded well to Zyprexa but it caused weight gain. Plaintiff was then given Risperdal, which he stopped because it did not help him sleep and he went back on Zyprexa. She further reported that he was currently taking Seroquel, Klonopin and Paxil. Tr. at 465.

Ms. Snider-Fuller stated that Plaintiff would have difficulty with sustaining five eight-hour work days per week. She observed that Plaintiff is very immature and expects his parents to do for him. She reported that he is angry at his parents and blames them for not helping him, although his mother is active in helping him. She further reported that Plaintiff's mother found that Plaintiff was getting more and more aggressive. Ms. Snider-Fuller stated that Plaintiff's attendance at appointments had not been consistent, so medication adjustment and symptom control have been slow. She reported that Plaintiff' ability to get along with co-workers, supervisors and the general public would be poor. His ability to respond appropriately to work pressures in a usual work setting would also be poor. Tr. at 466. She opined that Plaintiff is impatient, has poor coping skills to deal with his frustrations, and he has a history of domestic violence and aggressive behavior Tr. at 466.

Plaintiff treated in the emergency department on April 25, 2011. He reported that he was vomiting as a result of taking Seroquel. Tr. at 558. He came in to ask for Zyprexa instead of the Seroquel. He reported that he was having trouble sleeping Tr. at 558. On May 25, 2011, he treated in the emergency department following a motor vehicle accident. He reported that he hit his head on the steering wheel. Tr. at 572. He reported that he had a mild headache and lateral neck pain. He

was diagnosed with cervical strain. Tr. at 573. Plaintiff treated with Dr. Kea on June 26, 2011 complaining that he was having neck pains since the motor vehicle accident on May 25, 2011. Tr. at 590. He was continuing to have pain on the left side of the neck and posterior neck. He was taking Tylenol PM regularly. He was diagnosed with neck sprain and strain.

Plaintiff treated in the emergency department on July 21, 2011. His father reported that Plaintiff had been growing increasingly paranoid over the past several weeks. Plaintiff denied any paranoid thoughts. His father stated that Plaintiff tries to twist stories and make excuses for his behavior. Tr. at 477-478. Plaintiff reported that he lost his Zyprexa medication two days before, and he was concerned that strangers would come up and attack him. Plaintiff was asking inappropriate questions Tr. at 477. Plaintiff reported that he wanted to be checked to see if he had been shot, but was stating that he did not know whether he had been shot. Tr. at 477. Plaintiff was diagnosed with paranoid schizophrenia. Tr. at 478.

Plaintiff underwent a mental health assessment with Christian S. Steiner, M.D., that same day. Plaintiff's father reported that, three days prior, Plaintiff was involved in a car accident and was taken to the hospital via EMS and his Zyprexa was misplaced. Tr. at 481-482. Plaintiff's father reported that Plaintiff was at home and called and ordered a pizza. When the pizza delivery man came to the house, he snatched the money out of the hands of Plaintiff and ran away. Plaintiff got a call from the pizza parlor where he heard gun shots in the background. Since then, Plaintiff is ruminating on the fact that he was going to get shot. Tr. at 482. Plaintiff's father reported that Plaintiff was fearful of anyone who walks by the house and will not leave the house. Plaintiff agreed that he was scared of people but said that he will not hurt them. He would only harm someone if they actually came into his house. Tr. at 482. A mental status examination revealed Plaintiff was restless, guarded and suspicious. He had a constricted blunted affect and his speech had noted poverty. Tr. at 43. He was diagnosed with schizoaffective disorder and assigned a GAF score of 41-50, indicating serious difficulty in functioning.

Plaintiff treated with Ms. Snider-Fuller, on September 15, 2011 for a medication refill. He had not been seen in six months. After he was hospitalized, he was re-started Zyprexa. He reported that he was gaining weight and wants to try something else. Tr. at 498. He was diagnosed with

schizoaffective, bipolar type with insomnia; panic attacks with agoraphobia; and assigned a GAF score of 55-60. Tr. at 499.

Plaintiff treated with Ms. Snider-Fuller on October 8, 2011. He reported that he was doing better on Latuda and that he went to STNA school and passed and now wants to go to LPN school. Tr. at 519. He reported that he was having trouble sleeping and his primary care physician thought Ambien might be a good choice. He tried Klonopin at night and that was not helping his sleeping. Plaintiff had used it in the past when he had to go out and be around people since that is when he has anxiety attacks. His thought process was logical and organized. His thought content was paranoid, and his attention and concentration were sustained. Tr. at 519. He was assigned a GAF score of 65, indicating mild symptoms. Tr. at 520. On October 21, 2011, Plaintiff reported that the Zyprexa was working very well for him but he was gaining weight. Tr. at 504. At the time, he was taking Zyprexa, Klonopin and Paxil. He was diagnosed with schizoaffective, bipolar type; panic attacks with agoraphobia; and assigned a GAF score of 65. Tr. at 505.

On May 17, 2012, Plaintiff treated with Ms. Snider-Fuller. He stated that he was there to get himself together. She noted that it was difficult to determine how he was doing. He reported that he was still taking his medication. He reported that he takes Zyprexa sometimes and that he is taking Latuda. Tr. at 544. Ms. Snider-Fuller reported that answers about how he was taking his medication was a "moving target." Plaintiff told her that taking medications is scary for him and that he takes his Klonopin sometimes and Ambien every night. He also reported taking Paxil. Tr. at 544. On the mental status examination, his thought process was tangential and vague; his behavior was guarded; he had paranoid thoughts; his mood was anxious; and his mood was restricted. His attention and concentration were fair and his remote memory were fair. Tr. at 544. He was diagnosed with schizoaffective disorder, bipolar type; panic disorder with agoraphobia; and assigned a GAF score of 65. Tr. at 545.

Ms. Snider-Fuller completed a similar assessment on June 5, 2012.  This form was also signed by a psychiatrist, Toni Johnson, M.D.  The ALJ questioned the actual author of the form, ultimately concluding that Ms. Snider-Fuller completed the form and Dr. Johnson merely signed it. Tr .at 36-37.  According to the form, Plaintiff was seen four times in the last year. His diagnosis was

-10-

schizoaffective disorder, bipolar mixed type and anxiety disorder. Tr. at 467. Plaintiff's symptoms include paranoia, auditory hallucinations, mood swings, low energy, depressed and high energy anxiety. It was reported that, since the last questionnaire, Plaintiff had stopped Seroquel due to reported nausea and re-started Zyprexa and did fine except for weight gain. Plaintiff started Latuda which was tolerated and helpful. However, Plaintiff's progress was unclear because Plaintiff's reports of his symptoms were vague. Plaintiff has difficulty sustaining his activities. He has held jobs but has difficulty maintaining a routine. He missed appointments frequently and his medicine management was poor. His explanations were not always logical. Tr. at 467. According to the form, Plaintiff was frequently off his medications and his symptoms worsened. Tr. at 468. As a consequence, he was highly irritable and argumentative with his mother. Tr. at 468. Further, he was more paranoid and irrational in thinking and decision making. Plaintiff had mood swings when hypomanic; and he got very angry and irritable. It was also reported that Plaintiff has poor coping skills, a history of domestic violence, and aggressive behavior.

### B. Hearing testimony

At the hearing, Plaintiff testified that he saw Ms. Snider-Fuller once per month, and had seen Dr. Johnson a couple of times. Tr. at 37. He further testified that he does not have "direct contact" with Dr. Johnson, and that he saw her "when [he] first got sick and stuff like that," but had not seen her since then. Tr. at 38.

According to his testimony, Plaintiff worked as a pizza delivery man in 2011, but stopped because of his bipolar disorder and schizophrenia, which caused him anxiety attacks when he is in groups of people. Tr. at 38. Plaintiff testified that he experiences paranoia and does not want to leave his home. Tr. at 40-41. His mental disorders affect his personal relationships. He has an antagonistic relationship with his father, who also suffers from mental illness. Plaintiff testified that his parents have separate issues, and though he is closer to his mother, he is "stuck in the middle." Tr .at 47.

Plaintiff testified that his medication causes nausea and vomiting (Latuda), and has a sedative effect (Zyprexa), which causes him to sleep for long periods of time. Tr .at 39. Plaintiff takes Klonopin when he must be in a large group of people or he has to drive an automobile. Tr. at 39.

Ambien, which he takes for insomnia, acts as a appetite suppressant. Tr. at 39-40. He acknowledged that when he skips his prescribed medication it is reflected in his personality and his well-being. Tr. at 42.

Plaintiff spends a typical day at his grandmother's house, where he takes care of her and helps her clean. Tr. at 42.   Plaintiff explained that he struggles in a work environment because he often assumes that other people are going to harass him.  Tr. at 46.  He further explained that a regular person does not assume that someone is going to hurt them (for instance, a janitor), but Plaintiff becomes convinced that strangers are going to harass him.

Plaintiff's mother, Ms. Hudgines, testified that Plaintiff has held a few jobs but he can only last a month.  Tr. at 48. The longest position he held was as a short order cook.  Tr. at 49. However, after a year, Plaintiff could no longer keep the orders on track.  He worked at a gas station, but there was "too much going on" between gasoline and lottery ticket sales. Tr. at 49.  He was also concerned about being robbed, and experienced anxiety attacks as a result.  Ms. Hudgines summarized his problems as an inability to concentrate and anxiety problems.

Ms. Hudgines testified that, although Plaintiff is able to perform household chores, his sleep schedule prevents him from keeping regular hours, and his medication causes a general lack of energy.  Tr. at 50.  She further testified that Plaintiff does not need to be prompted to take his medication, but he sometimes runs out of medication because he forgets that it must be refilled.  Tr. at 51-52. When he runs out of medication, Ms. Hudgines must call Plaintiff's doctor and there is typically a delay.  Plaintiff is reluctant to go to the hospital, or to accurately describe his state of mind to hospital physicians, because he fears he will be committed. Tr. at 52. He had a frightening experience where he was admitted to a hospital, put in a straight jacket, then transferred to another hospital where he was medicated and lost consciousness for two days.  Tr. at 56.

According to Ms. Hudgines, Plaintiff applied for disability in order to be eligible for the prescription, Deparkote, which  provides effective treatment for his father.  Plaintiff's doctor told her that, if Plaintiff "got disability and the right insurance," he could be prescribed Deparkote.  Tr. at 54.  Ms. Hudgins explained that she could not describe Plaintiff's behavior because she rarely spent time with him. Tr. at 54. Although they live together, she works during the day.  Tr. at 54. She

testified that Plaintiff is uncomfortable at restaurants. Ms. Hudgines further testified that she does not think his medication is effective, and conceded that she is looking for a "miracle pill" that can give her son a normal life. Tr. at 55.

### C. Agency physicians

State agency medical consultant, Melanie Bergsten, Ph.D., on March 21, 2009, opined that Plaintiff was able to understand simple and multiple step instructions and that his ability to maintain concentration, relate to others and withstand normal work day stress and pressures were moderately impaired by his psychological conditions. Tr. at 364. She opined that he could perform simple and multiple step tasks in an environment where changes are infrequent and easily explained and that he could relate to a few familiar others on a superficial basis. Tr. at 365. State agency medical consultant, Joan Williams, Ph.D. on June 20, 2009, observed that Plaintiff was an individual that is symptom-focused, which is uncharacteristic of people with incapacitating psychotic illness who tend to deny mental symptoms. Dr. Williams affirmed the prior mental claim disposition dated March 21, 2009. Tr. at 607.

State agency medical consultant, Carolyn Lewin, Ph.D., reviewed the case on December 8, 2010. Tr. at 69. She opined that Plaintiff would be moderately limited in his ability to accept instructions, respond appropriately to criticism from supervisors and moderately limited in the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Tr. at 70. She opined that Plaintiff would be moderately limited in his ability to respond appropriately to changes in the work setting. She opined that he would have adequate stress tolerance if taking his medication but, if not, his paranoia and mood swings would cause him to overact and not relate well. He was fired from one job as a result of his failure to take his medication. Tr. at 71. She also stated that Plaintiff would have no problems with instructions or concentration in a routine static environment where relating is minimized. Tr. at 71.

### D. The ALJ's decision

In concluding that Plaintiff was not disabled, the ALJ acknowledged that Plaintiff suffered exacerbations of his mental problems, typically as a result of not taking his medication, but recognized that Plaintiff responded positively as soon as he resumed taking his medication. The ALJ

-13-

further relied upon the fact that, even when Plaintiff's symptoms were exacerbated, that is, when Plaintiff experienced delusions, his appearance, behavior, orientation, speech, attention span, mood, judgment, insight, and thought processes were otherwise normal. Tr. at 18. Even when Plaintiff was assigned a GAF score of 45 (indicating serious symptoms) in 2010, within a few weeks after his dosage of Zyprexa was increased, he was assigned a score in the moderate range and a mental status exam revealed no evidence of paranoia or perceptual disturbances. Tr. at 19, 384. In 2011, Plaintiff was assigned a GAF score of 65, indicating only mild functional limitations, after his medication was changed to Latuda. At the time, Plaintiff was attending school and planned to enroll in a nursing program. Tr .at 20.

In according weight to the various medical and other source opinion evidence in the record, the ALJ gave little weight to the opinions of the state agency psychologists who concluded that Plaintiff was not significantly limited in understanding and memory and sustained concentration and persistence. Based upon his observation of Plaintiff, the ALJ assigned greater limitations to Plaintiff than the agency physicians.

However, the ALJ also gave little weight to the opinion of Ms. Snider-Fuller.[4] Ms. Snider-Fuller opined that Plaintiff's symptoms included paranoia, auditory hallucinations, mood swings, low energy, and anxiety. She further opined that Plaintiff could not get along with coworkers or maintain and eight-hour work day due to his immaturity and difficulty controlling his anger. In affording Ms. Snider-Fuller's opinion little weight, the ALJ specifically cited her conclusion that Plaintiff suffered from auditory hallucinations, because the medical evidence showed that, even in periods of exacerbation of his mental illness, he suffered no auditory or visual hallucinations. The ALJ also cited Ms. Snider-Fuller's opinion that Plaintiff would be less irritable and argumentative if he maintained his medication schedule. Moreover, the ALJ concluded that Ms. Snider-Fuller's opinion was at odds with the majority of the medical evidence. The ALJ recognized that the record

---

[4]The ALJ concluded that the evaluation completed by Ms. Snider-Fuller, but signed by Dr. Morrison, reflected Ms. Snider-Fuller's opinion. He relied upon the fact that Plaintiff testified that he only saw Dr. Morrison once or twice. Tr. at 21.

-14-

contained only two incidents of exacerbation, and otherwise showed good mental status evaluation results and GAF scores in the moderate range.

### E. Opinion evidence

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Finally, evidence from "other sources" may not be used to establish the existence of a medically determinable impairment or given controlling weight, however, the ALJ may use evidence from "other sources" to demonstrate the severity of the claimant's impairments and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d)(1); *Cruse v. Comm'r*, 502 F.3d 532, 541 (6th Cir.2007. "Other sources" include nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists. *Id.* When considering opinions from non-medical sources who have seen a plaintiff in a professional capacity, the ALJ should look to several factors, including the opinion's consistency with other evidence, how long the source has known the individual, and how well the source explained his opinion. *Winning v. Comm'r of Soc. Sec.*, 661

F.Supp.2d 807, 820 (N.D.Ohio 2009) (citing *Cruse, supra*, at 541.) Under the regulations, the ALJ therefore has the discretion to determine the appropriate weight to accord the nurse practitioner's opinion based on all the evidence.

Plaintiff contends that the ALJ should have given greater weight to Ms. Snider-Fuller's opinion that he is incapable of performing full-time work, because her opinion is supported by his frequent visits to the emergency room and his altercations with his father and girlfriend. However, an impairment remedied by treatment cannot serve as a basis for a finding of disability. *Harris v. Heckler*, 756 F.2d 431, 436 (6th Cir.1985). The regulations mandate, in relevant part, when a claimant does "not follow prescribed treatment .... without good reason" he will not be found disabled. 20 C.F.R. § 404.1530. Good reason includes refusal based on religious beliefs, refusal of repeated surgery to accommodate the same medical issue, and refusal of treatment based on magnitude of risk. *Id.*  Here, the ALJ concluded that Plaintiff was capable of a full-time employment,  with certain non-exertional limitations, if he maintained his prescribed medical regimen.

Though the Eighth Circuit has suggested noncompliance with medication could be justified by mental illness, see *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir.2009), it has since clarified its position by holding noncompliance by mentally ill claimants will be justified when there is some evidence linking the mental illness to the noncompliance. See *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir.2010). Here, Ms. Hudgines testified that Plaintiff knows he is ill, and Plaintiff testified that he is aware of the consequences when he does not take his medication. Likewise, Dr. Williams, the state agency medical consultant, observed that Plaintiff was an individual  that is symptom-focused, which is uncharacteristic of people with incapacitating psychotic illness who tend to deny mental symptoms. Therefore, Plaintiff's periodic failure to take his medication has not been shown to be related to his mental illness.

Of equal import, in concluding that Plaintiff is not disabled, the ALJ cited Ms. Snider-Fuller's opinion that Plaintiff's failure to take his medication is the cause underlying exacerbation of his mental illness. The ALJ credited this part of Ms. Snider-Fuller's opinion because it is supported by the record.  Plaintiff's trips to the emergency room are typically the result of his failure

to take his prescribed medication, and the record bears out that his mental condition stabilizes quickly after he resumes taking his medication. Accordingly, the ALJ did not err in declining to give greater weight to the opinion of the nurse practitioner, and his decision is supported by substantial evidence in the record.

### VI. CONCLUSION

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

DATE: December 22, 2014

                                      */s/George J. Limbert*
                                      GEORGE J. LIMBERT
                                      UNITED STATES MAGISTRATE JUDGE

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).